[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON MOTION FOR JUDGMENT ON REFEREE'S REPORT
The attorney trial referee, Kenneth B. Povodator, Esq., submitted a report on September 18, 1992. The referee recommended that the court enter judgment for the defendants, Mardant Associates, Inc. and Dante Montagnesi, on all counts of the complaint of the plaintiffs, John Zavitz and Jo Cat Management, Inc. The referee further recommended that the court enter judgment in favor of the defendants against the plaintiff, John Zavitz, on the counterclaim in the amount of $78,209.66.
The referee's report, in conformity with P.B. Sec. 434, consisted of a statement outlining the procedural history of the case, thirty six paragraphs of Findings of Facts, eleven paragraphs of Conclusions, and an extended memorandum addressing the reasons for and basis of his conclusions.
The plaintiffs moved to correct certain of the findings. The referee modified certain findings, but refused to correct others. The referee did not modify his conclusions or recommendation for judgment. The corrected findings were filed on November 30, 1992. CT Page 1257
The plaintiffs took no exception to the referee's action on the motion to correct under the provisions of P.B. Sec. 439.
The defendants have moved for judgment on the report. The plaintiffs have filed an objection to the acceptance of the report. The complaint was in seven counts, alleging fraudulent and negligent misrepresentation, breach of good faith and fair dealing, violation of the Connecticut Unfair Trade Practice Act ("CUTPA") and violation of the Connecticut Uniform Securities Act. The plaintiffs' specific objections alleged: ". . . that the Referee's conclusions that Montagnesi did not breach his duty of good faith and fair dealing or violate CUTPA were not properly reached, and that the referee misapplied the law with regard to the two legal theories."
 I.
In summary, the attorney trial referee found:
Montagnesi was an accountant and he serviced small businesses, many of which were restaurants. He had informally appraised restaurants on a number of occasions and had ownership interests in restaurants at various times. He began rendering personal and business accounting and consulting services to the plaintiff Zavitz in 1967 and continued as Zavitz's accountant through 1988. Zavitz had himself been involved in the ownership and operation of businesses, including a music store and a personnel service business.
Montagnesi purchased a Baskin-Robbins franchise ice cream store in March, 1985, at a cost of $90,000. When he purchased the business, he knew it had been operating at a loss.
In the Summer of 1986, he decided to sell the business. He prepared a financial document ("Exhibit K") to be shown to prospective purchasers. Although the document was prepared in the second half of 1986, it did not contain the correct figures for business income in 1985 and gave no indication of the income for the first half of 1986 (although it did indicate expenses, only some of which were verifiable). The figures for the full year 1986 were projections, extrapolated in part from actual figures for the first half of the year. The 1985 figure for income/revenue on the document was a hypothetical figure, based on the actual quantity (or a reasonable estimate) of merchandise CT Page 1258 (ice cream) sold, but at a theoretical/estimated revenue level that Montagnesi believed was attainable with proper management (revenue of $47.00 a tub of ice cream).
The plaintiff Zavitz admitted he knew of the hypothetical nature of this figure, before he began any discussion about purchasing the store. The actual revenue per tub of ice cream sold for 1985, was materially less that $47.00 per tub, and the gross revenue was materially less than the figure on the document.
Montagnesi's operation of the business included "cash" or "off the books" transactions which were never recorded in any business record — certain receipts from out of store sales were not recorded, and some employees were paid partly or wholly in cash from those receipts. These receipts and off the book payments to employees were approximately equal.
Starting in November 1986, Zavitz began to work in the store, progressively assuming a variety of managerial and operational duties. While an employee, Zavitz himself received part of his compensation in "off the books" cash and was aware of the existence of other such "off the book" cash transactions both as to receipts and payments. The admitted purpose for not reporting all cash receipts was avoidance of 2% of gross revenues franchise fees to Baskin-Robbins. An additional effect was to reduce taxes and expenses which are or would be calculated and based in whole or in part on payroll, such as Social Security.
After Zavitz purchased the business from Montagnesi, he himself continued the practice of engaging in such cash transactions "off the book" and increased the gross amounts of payments to employees (including himself) that was not recorded. He knew or should have known that this practice of "off the books" cash transactions as to receipts and expenses made any recorded revenue and expense figures unreliable.
Although at some point, before selling the business to Zavitz, Montagnesi had offered to sell a one-half interest in the business to another for $50,000.00, he sold the business to Zavitz for a price of $150,000.00, which consisted of $75,000.00 in cash and a note payable to Montagnesi in the principal amount of $75,000.00. CT Page 1259
Montagnesi knew that Zavitz did not have any cash to invest in the store and that Zavitz was borrowing the $75,000 cash that was being paid to him for the purchase. He knew that Zavitz would have to service $150,000.00 in notes from the proceeds of the store.
The note from Zavitz to Montagnesi required payment of 12% interest annually, interest only, with the principal due at the end of five years. The other note had similar terms, but also required payments against principal at the rate of $1.00 per tub of ice cream sold.
Zavitz knew or should have known then that he would owe the note holders, at the end of five years, $150,000 (less any payments against principal on the second note).
During the period of his ownership, Montagnesi had put additional funds into the business to cover operating losses. However, Montagnesi told Zavitz that he would not have to put in any additional funds to keep the business in operation, if the business were properly managed. Montagnesi reasonably believed that the operating losses incurred during his ownership of the store in 1986 were attributable to management problems. It was these problems that Zavitz was hired, in part, to remedy.
Montagnesi told Zavitz that his valuation of the business and asking price was $150,000, assuming that the purchase price included his having to finance half the purchase price over time. On February 3, 1987, however, Montagnesi sent a letter to Baskin-Robbins indicating that the price that was to be paid by Zavitz was $90,000.00 plus the cost of inventory and security deposits. Baskin-Robbins had previously indicated to Montagnesi that it thought the value of the store was $90,000.00, based on a formula it used for purposes of determining the value of franchise outlets.
Montagnesi did not advise Zavitz to consult with an independent accountant concerning the sale.
 II.
The referee's third conclusion was:
 3. Plaintiff failed to prove that Defendant breached his obligation of good faith and fair dealing in CT Page 1260 connection with the performance of the contract for the sale of the store.
The plaintiffs claim that this third conclusion of the referee "was in error because he restricted his consideration to contract performance, but did not consider that the duty of good faith and fair dealing extended to the process of negotiating and executing the contract."
The plaintiffs claim that the facts found indicate Montagnesi took advantage of his status as Zavitz's accountant and friend in connection with negotiating the agreement for the sale of the business.
However, even if the requirements of good faith and fair dealing were applicable to the negotiation and execution of the contract, the facts found by the referee would support his conclusion. The trial referee, evaluating the credit of the witnesses, found that Zavitz knew the figures in Exhibit K were not factual. It was an estimate of what Montagnesi believed was attainable provided there was proper management. Zavitz was an experienced business man.
Zavitz had been employed in the business he contracted to purchase, purportedly as a better manager, for a period of time. He was aware of, participated in, and continued the practice of "off the book" cash transactions. As the referee pointed out neither of the participants had completely clean hands. The referee believed that it was the employer-employee relationship which was relevant to the agreement to sell the store, since the plaintiff had participated in the actual operation of the store before contracting for its purchase and has not established that he was denied access to the books.
Zavitz chose to engage in a small scale leverage buyout — borrowing 100% of the purchase price, with the business itself as security — with the attendant risks of such a transaction in a business which he knew had an unverifiable financial record because of "off-the-book" transactions. The referee found no deception of the plaintiff Zavitz by the defendant Montagnesi.
 III.
The plaintiffs claim the referee's conclusion that there was no violation of CUTPA was based on his opinion that CUTPA is CT Page 1261 not an available remedy in an isolated transaction, such as the sale of this business by Montagnesi, which was not part of his trade or regular business.
The referee found, and the finding was not challenged, that the plaintiff Zavitz failed to prove the defendant Montagnesi's statements concerning cashflow and profitability, conditioned on improved management of the business in the future, constituted a statement of fact. He also found that Zavitz failed to prove that Montagnesi's statement that the business was worth $150,000. was a statement of fact nor did he prove that it was a statement on which he reasonably could have relied.
Accepting that CUTPA does apply to the one time sale of a business by someone not in the business of such sales, the referee concluded, as expressed in his memorandum, that there was no CUTPA violation because there was no deceptive practice or unscrupulous behavior proven, given the plaintiff Zavitz's particular knowledge and situation.
Since there was an ample basis in the corrected findings and the conclusions of the referee to sustain his determination that the plaintiffs had not proven a breach of good faith and fair dealing and had not proven any CUTPA violation, the plaintiffs' objection to the report of the referee is overruled. The defendants' motion to accept the report is sustained.
Judgment is entered in favor of the defendants and against the plaintiffs on all counts of the complaint. Judgment is entered in favor of the defendant Montagnesi and against the plaintiff Zavitz on the counterclaim in the amount of $78,209.66.
NIGRO, J.